# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TONY LEE LINTON,

Defendant-Appellant.

UNPUBLISHED
December 15, 2016

No. 328930
Newaygo Circuit Court
LC No. 15-011017-FH

Before: WILDER, P.J., and MURPHY and O'BRIEN, JJ.

PER CURIAM.

Defendant, Tony Lee Linton, was convicted by a jury of manufacturing or delivering methamphetamine, MCL 333.7401(2)(b)(*i*), second offense, MCL 333.7413(2), and operating or maintaining a laboratory involving methamphetamine, MCL 333.7401c(2)(f), second offense, MCL 333.7413(2). He was sentenced to concurrent prison terms of 5 to 40 years for each conviction. He appeals as of right his August 4, 2015 judgment of sentence. We affirm.

This case arises out of the traffic stop of defendant, Ethan Cumberledge, and Mark Grove on October 23, 2014. On that evening, law enforcement was searching the area surrounding the location of the stop after several suspects fled from a nearby residence during an unrelated investigation. As a part of that investigation, Newaygo County Deputy David Israel had pulled over and was speaking with one of the suspect's girlfriends. During their conversation, Israel noticed a pickup truck approaching that "caught [his] attention." Israel decided to "step out in the roadway and stop the vehicle to make sure that the occupants of the vehicle weren't the suspects that [law enforcement was] looking for."

Israel approached the vehicle, where he found Cumberledge in the driver's seat, Grove in the middle seat, and defendant in the passenger seat. Israel asked the occupants for their identification, Cumberledge and Grove provided theirs, and defendant initially refused but eventually provided his hunting license. According to Israel, defendant "stated that he was up in the area raccoon hunting," claimed to have done "nothing wrong," and was verbally aggressive" and "very argumentative" with him. After learning that Cumberledge was driving on a suspended license and had an outstanding arrest warrant, Israel arrested him and eventually

-1-

placed him in his patrol vehicle.[1]  When Israel re-approached the pickup, he "could smell a strong odor of chemicals coming out of the vehicle."

Eventually, Israel "notice[d] a black bag that was not in the rear of the pickup truck when [he] first stopped it."  Inside of that bag, Israel found what he recognized as "a one-pot Methamphetamine lab."  Recognizing the extremely hazardous nature of this, Israel requested that additional officers come to the location of the traffic stop.  One of those officers, Michigan State Police Detective Lieutenant Joel Abendroth, who testified "as an expert in Methamphetamine investigation" at trial, "immediately recognized it as a one-pot Methamphetamine lab that had failed."  Also inside of the bag or elsewhere in the pickup, law enforcement found "blister packs of Sudaphedrine," "a plastic pill grinder," "two, double A lithium batteries," "[a] bottle of lye or sodium hydroxide," "a plastic bottle, with no label" that "tested positive as a strongly acidic liquid, which . . . was either muriatic or sulfuric acid," "an instant cold pack packaging," "a gallon of Coleman fuel," and "[a] one-pound container of table salt."[2]  According to Abendroth, these "components" "are all used to manufacture Methamphetamine using the one-pot method."

At trial, in addition to Israel's, Abendroth's, and three other officers' testimony, the prosecution presented Cumberledge's and Grove's testimony against defendant as well. Cumberledge testified that defendant "was cooking Methamphetamine" in the pickup shortly before the traffic stop on the evening of October 23, 2014.  He recalled defendant retrieving "one of the bags," removing various "components for the one pot" such as "Coleman fuel, a cold pack, and . . . a thing of lye," and "mixing them and putting them into the bottle."  Grove testified similarly, recalling that defendant had various methamphetamine components "[f]izzing" in a Mountain Dew bottle in the pickup shortly before the traffic stop that evening.

Defendant testified on his own behalf at trial, denying that he was involved in any way with methamphetamine on the night at issue and opining that Cumberledge and Grove testified against him "just to get off."  As indicated above, he was convicted as charged and sentenced to 5 to 40 years in prison on each count.  This appeal followed.

On appeal, defendant's sole argument is that the jury's verdict on the charge of manufacturing or delivering methamphetamine was against the great weight of the evidence.  To preserve a challenge based on a claim that the verdict was against the great weight of the evidence, a defendant must have raised the issue in the trial court by moving for a new trial. *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).  Here, defendant did not move for a new trial and consequently failed to preserve this issue for appeal.  *People v Cameron*, 291 Mich App 599, 618; 806 NW2d 371 (2011).  We review unpreserved issues for

___

[1] According to Deputy Israel, Grove and defendant also had outstanding arrest warrants, but they were not immediately arrested because the warrants were out of other counties.

[2] Law enforcement also found a coffee filter with methamphetamine residue on it, but it appears that the filter was used earlier in the evening to snort "a line" of methamphetamine and unrelated to the manufacturing that was taking place inside of the pickup.

plain error affecting substantial rights. *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). "[U]nless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id*. at 645-646 (citation omitted). [*Musser*, 259 Mich App at 218-219 (alteration in original).]

Defendant was convicted of manufacturing or delivering methamphetamine pursuant to MCL 333.7401(1), which provides, in relevant part, as follows: "Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance . . . ." "With respect to manufacturing methamphetamine, the elements are (1) the defendant manufactured a controlled substance, (2) the substance manufactured was methamphetamine, and (3) the defendant knew he was manufacturing methamphetamine." *People v Meshell*, 265 Mich App 616, 619; 696 NW2d 754 (2005); see also MCL 333.7401(1). Similarly, with respect to delivering methamphetamine, the elements are (1) the defendant delivered a controlled substance, (2) the substance delivered was methamphetamine, and (3) the defendant knew he was delivering methamphetamine. See MCL 333.7401(1); see also M Crim JI 12.2. MCL 333.7106(3) defines " '[m]anufacture' [as] the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis." MCL 333.7105(1) defines " '[d]eliver' or 'delivery' [as] the actual, constructive, or attempted transfer from 1 person to another of a controlled substance, whether or not there is an agency relationship." MCL 333.7105(1). "Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177, 180 (1993).

In this case, the record reflects that there was an overwhelming amount of evidence introduced at trial that defendant manufactured methamphetamine.

First, there was a substantial amount of evidence that defendant was the individual engaged in the manufacturing process. Both Cumberledge and Grove testified that defendant removed a bag containing the components for making methamphetamine from the bed of the pickup and brought it into the passenger compartment. Cumbledge and Grove both testified that defendant mixed a variety of these components together in a Mountain Dew bottle. Law enforcement would later recover blister packs of Sudaphedrine, a pill grinder, double A batteries, a Mountain Dew bottle, a bottle of lye or sodium hydroxide, an unlabeled bottle that tested

positive for "a strongly acidic liquid," and cold pack packaging, and expert testimony established that these were all undoubtedly used in the pickup to manufacture methamphetamine. Thus, there was substantial evidence that defendant was involved in "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance . . . by means of chemical synthesis" and thereby "manufacturing" methamphetamine. See MCL 333.7106(3); see also *Meshell*, 265 Mich App at 619.

Second, there was a substantial amount of evidence that the substance produced by defendant was methamphetamine. Both Israel and Abendroth smelled a strong chemical odor inside the pickup, and both affirmatively identified the Mountain Dew bottle as being used to manufacture methamphetamine in the one-pot method. In short, Abendroth had "no doubt there was an active Methamphetamine lab" in the pickup at some point. In addition and as discussed above, the testimony of Cumberledge and Grove identified the substance being made in the Mountain Dew bottle as methamphetamine, and law enforcement recovered items from the pickup that are commonly used to manufacture methamphetamine according to Abendroth. Contrary to defendant's assertion that there was no evidence that methamphetamine was manufactured, there was a substantial amount of evidence that methamphetamine was being produced in the Mountain Dew bottle, and the jury could have reasonably concluded that this element was proven beyond a reasonable doubt. See *Jolly*, 442 Mich at 466; see also *Meshell*, 265 Mich App at 619.

Third, there was a substantial amount of evidence that defendant knew that he was manufacturing methamphetamine. Both Cumberledge and Grove testified that they used methamphetamine with defendant at his house before leaving to go raccoon hunting. Furthermore, Cumberledge had used methamphetamine with defendant before, had seen defendant make methamphetamine using the same one-pot method before, and had sold Sudafed to defendant for the purposes of making methamphetamine. Moreover, law enforcement recovered a combination of items from the truck that produce methamphetamine when mixed together and observed a chemical reaction in a bottle of the type that occurs when making methamphetamine using the one-pot method. Additionally, the prosecution presented evidence that defendant had purchased a high volume of Sudafed during the year prior to the traffic stop at issue in this case. This evidence strongly supports a conclusion that defendant knew that he was manufacturing it in the truck. See *Jolly*, 442 Mich at 466; see also *Meshell*, 265 Mich App at 619.

Accordingly, we conclude that the jury's verdict, assuming that it was premised on a manufacturing theory, was not against the great weight of the evidence. *Musser*, 259 Mich App at 218-219. On appeal, defendant's only argument against such a conclusion relies on his assumption that "failed" attempts at manufacturing methamphetamine cannot constitute the manufacturing of methamphetamine pursuant to MCL 333.7401(2)(b)(*i*). He does not provide citation to, and we are unable to find, any legal authority supporting such a position. Thus, this argument is abandoned. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Furthermore, regardless of whether his manufacturing efforts proved successful or unsuccessful, we are ultimately persuaded by the fact that he was, indeed, manufacturing methamphetamine. As he admits in his brief, "[t]here was evidence of an attempt to manufacture methamphetamine . . . ."

Similarly, there is strong evidence that defendant delivered methamphetamine. Both Cumberledge and Grove testified that they used methamphetamine with defendant in defendant's bedroom before leaving to go raccoon hunting.[3] Cumberledge testified that before leaving defendant's house, he and defendant each snorted "a line" of methamphetamine in defendant's bedroom. According to Cumberledge, it was defendant who gave the methamphetamine to him that they snorted. From this evidence, the jury could have reasonably concluded that defendant transferred the methamphetamine to Cumberledge, which is sufficient to establish the delivery element. See *People v Schultz*, 246 Mich App 695, 703-704; 635 NW2d 491 (2001); see also MCL 333.7105(1).

Defendant's argument against these conclusions relies on his claim that Cumberledge's testimony was "self-serving" and not credible, but such an argument is merely a request to credit contradictory testimony that appears more favorable to defendant. "It is the province of the jury to determine questions of fact and assess the credibility of witnesses," and requests for a new trial "based solely on the weight of the evidence regarding witness credibility are not favored." *Lemmon*, 456 Mich at 637, 639. Although witnesses disagreed as to whether Grove was present when defendant and Cumberledge snorted methamphetamine, defendant had the opportunity to cross-examine Cumberledge at trial and Grove at the preliminary examination. *Id*. at 646. Defendant also testified at trial in his own defense. *Id*. Furthermore, Cumberledge's testimony was not "so far impeached that it was deprived of all probative value or that the jury could not believe it," nor did it contradict indisputable physical facts or defy physical realities. *Musser*, 259 Mich App at 219 (quotation marks and citation omitted). Ultimately, the jury had the opportunity to evaluate the credibility of the witnesses and weigh the evidence before finding defendant guilty, and we defer to its credibility determinations in doing so. *Musser*, 259 Mich App at 219.

In sum, the evidence here did not "preponderate[] so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Musser*, 259 Mich App at 218-219. Therefore, defendant has failed to demonstrate any error, much less one that was plain and affected his substantial rights. *Carines*, 460 Mich at 763.

Affirmed.


/s/ Kurtis T. Wilder
/s/ William B. Murphy
/s/ Colleen A. O'Brien

---

[3] The only disparity in this testimony related to whether Grove was present at that time, a disparity that we find largely irrelevant.